UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MCMAHON HELICOPTER
SERVICES, INC. and U.S.
SPECIALTY INSURANCE CO.,

      Plaintiffs,

v.                                    Case No. 04-74133

UNITED STATES OF AMERICA,        HONORABLE AVERN COHN
WAYNE COUNTY AIRPORT
AUTHORITY d/b/a WILLOW RUN
AIRPORT, SEAN BROSNAN and
JOHN DOE(S),

      Defendants.

_____/

**MEMORANDUM AND ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

**I. Introduction.**

    This is a negligence case.  Plaintiff McMahon Helicopter Services, Inc.

(McMahon) is suing Defendants United States,[1] Wayne County Airport Authority, d/b/a

Willow Run Airport (the Airport Authority), Sean Brosnan (Brosnan), and an unknown

"John Doe" (Doe) alleging property damage arising out of an incident where a helicopter

owned by McMahon struck a light pole on the Airport Authority's property.  Plaintiff U.S.

Specialty Insurance Company (USSIC) insured McMahon's helicopter and filed an

action seeking subrogation for monies it paid to McMahon resulting from its helicopter

_____

      [1] The United States is a party because of the Federal Aviation Administration's
role in employing air traffic controllers and ensuring airports comply with federal
regulations.

loss.  The Court consolidated McMahon and USSIC's claims into this single action, and

plaintiffs filed a consolidated amended complaint (Consolidated Complaint).  The

Consolidated Complaint sets forth the following claims:

> Count 1:   negligence against the United States under the Federal Tort Claims Act, 28 U.S.C. § 1346 (FTCA);
>
> Count 2:   common law negligence against the Airport Authority;
>
> Count 3:   common law gross negligence against Brosnan and Doe.[2]

USSIC resolved its claims against all defendants.  The following motions are now

before the Court:

- United States' Motion for Partial Dismissal Based on Lack of Subject Matter Jurisdiction for a claim of negligent monitoring of compliance with federal regulations (D/E 75), [3]

- Airport Authority's Motion for Summary Judgment based on government immunity (public building exception does not apply) and federal preemption (federal law provides the standard of care) (First Motion) (D/E 72);

- Airport Authority's Second Motion for Summary Judgment and Joinder by Brosnan based on McMahon's acceptance of an insurance payment from USSIC and USSIC's release of the Airport Authority (Second Motion) (D/E 82 & 85);

- Brosnan's Motion for Summary Judgment, based on immunity, federal preemption, and the legal sufficiency of the claims (Brosnan Motion)(D/E 70).

For the following reasons, the U.S's motion is GRANTED, the First Motion is

GRANTED, the Second Motion is DENIED, and the Brosnan Motion is GRANTED in

---

[2] More than a year after filing the Consolidated Complaint, McMahon has not provided the identity of Doe.  McMahon identifies Doe as "employees, agents, or independent contractors acting on behalf or at the direction of" Brosnan and/or the Airport Authority.

[3] The United States' motion does not implicate McMahon's claim for negligent provision of air traffic control services.

2

part and DENIED in part.

## II. Background.[4]

### A. The Airport.

Willow Run Airport (Airport), in Ypsilanti, Michigan, is a busy commercial airport under the Airport Authority's jurisdiction. The Airport is open 24 hours a day for cargo shipments and other aviation activity. Brosnan is the Airport's director.[5] McMahon frequently uses the Airport to conduct its business; it is unclear whether McMahon uses the airport as a "home base" for any of its aircraft.

The Airport has at least two areas supporting cargo transportation: the south

---

[4] The background is gleaned from the parties' papers.

The Airport Authority and Brosnan deem certain facts admitted because McMahon did not respond to the Airport Authority's "First Request for Admissions and Second Set of Interrogatories." The Airport Authority sent the request to McMahon on March 15, 2006, about one month before the discovery cut-off date established by the Court. It is unclear whether McMahon ever responded. The Court cannot deem all of the facts admitted based on McMahon's failure to respond, particularly when it must make all reasonable inferences in McMahon's favor. However, McMahon does not dispute some of the asserted facts in its motion papers, and some facts can be established independent of McMahon's so-called admissions. The Court relies on these alternative bases for determining what the basic facts of the case are.

The parties followed the Court's summary judgment motion practice guidelines but for the following exception: McMahon did not highlight the relevant portions of its exhibits. For the Court's motion practice guidelines, see http://www.mied.uscourts.gov/_practices/Cohn/motion.htm.

[5] Brosnan was hired by the Airport Authority in February, 1997, as airport manager, was promoted to director in 2000, but continued to perform the duties of the airport manager as well. Whatever his title, at all relevant times Brosnan was the Airport Authority's top employee at the Airport.

cargo ramp and the west cargo ramp.[6]  Each ramp connects the runways and airfield to

a large aircraft hangar (south hangar and west hangar).  The Airport Authority says the

south cargo ramp is used to park or load and unload cargo onto airplanes.  The west

cargo ramp contains a "Customs Circle" where aircraft clear customs after an

international flight.  The west cargo ramp also appears to have an area where aircraft

can park and load and/or unload with cargo.

In about 1986 or 1987, the Airport Authority installed six light poles adjacent to

the south cargo ramp as part of a federally funded capital improvement grant.  The

Airport Authority says the poles were approximately 65 feet tall.  McMahon says the

poles were 80 feet tall.  The poles lit the ramp only and were shrouded so as to be

invisible to air traffic.  The light poles facilitated cargo handling during night-time hours.

During the 1990s, the six light poles became inoperative.[7]  No map provided to the

general public and no "Notice to Airmen"[8] identified the existence of the poles.

In about 1999 or 2000, a tenant of the south hangar asked that the lights be

turned on.  Brosnan knew of this request.  Soon thereafter it was determined that the

light poles could not be repaired.  Brosnan began requesting funding to replace the light

poles as part of a Airport federal grant application.  In October, 2003, the Federal

_____

[6] Based on the maps provided by the parties, there appears also to be a ramp and hangars on the east side of the airfield.

[7] Brosnan says he was told an animal ate through the electrical cable leading to the light poles.  The reason the light poles did not function is immaterial to the issue in the case.  The significant facts are that the light poles were inoperative and that Brosnan knew this for up to five years.

[8] A "Notice to Airmen" is a mechanism to inform pilots of certain conditions at an airport.  It is unclear whether the Airport Authority, the FAA, or both, can issue a notice.

4

Aviation Administration (FAA) approved the grant application.

### B.  McMahon.

McMahon transports manufactured goods in large cargo helicopters, particularly automobile parts for "just-in-time" delivery in the southeast Michigan automobile industry.  McMahon transports some of the goods to and from Canada.  McMahon owns an unknown number helicopters, and possibly other aircraft.  One of McMahon's helicopters was a Sikorsky S-58DT helicopter, federal registration number N598S (Helicopter).  McMahon insured the Helicopter through USSIC.  In 2003, McMahon insured the Helicopter for $600,000 with a $60,000 deductible.  McMahon says the Helicopter had a value of $1.2 million.[9]  Due to the declining economy and impact of the 9/11 tragedy on the aviation industry and insurance prices, McMahon says it intentionally under-insured the Helicopter.

### C. Aviation Regulation.

The FAA regulates aviation traffic and airport facilities.  As part of the regulation, the FAA employs air traffic controllers to manage the airspace.  The FAA also regulates potential obstructions in airspace.  14 C.F.R. 77 (Part 77) creates an imaginary, three dimensional, map defining the navigable airspace to ensure aviation safety.  In its description of the navigable airspace, Part 77 begins on the runways and taxiways.  Navigable airspace widens, using a complex formula, as altitude increases.  If a stationary object penetrates the Part 77 imaginary map, it is considered an obstruction and must be removed or marked with obstruction lighting.  If the object is not an

---

[9] In another brief, McMahon says the Helicopter was under-insured "by approximately $500,000.  This suggests the Helicopter had a value of $1.1 million.

5

obstruction it need not be marked.  Part 77 imposes many other aviation safety obligations on airports.[10]

The airport and the FAA conduct a Part 77 review for any new construction or alteration.  The Airport Authority and Brosnan say the six light poles were, upon completion and at all relevant times, compliant with Part 77.  The FAA's annual review included an examination of Part 77 compliance and the Airport's lighting system to prevent interference with the air traffic control tower.  FAA Order 5280.5B, § 326, paragraph 9.  According to each "Letter of Correction" from 1989 through 2004, the light poles were compliant.  It is unclear whether the FAA knew the light poles were inoperative.  In addition to Part 77 review, Brosnan directed a periodic obstruction survey to ensure Part 77 compliance.  Neither the 1994 nor 2002 survey identified a light pole as an obstruction.

### D.  The Accident.

On December 22, 2003, at approximately 6:00 p.m., the Helicopter sought to land at the Airport.  The Helicopter was coming from Windsor, Canada, thus it needed to clear customs.  McMahon says it was a hazy evening.  Randal Reeves, the pilot, was operating under visual flight rules (VFR).  The conversation between the pilot and air traffic control at the Airport was as follows:

> Pilot:  roger sir indicating six point seven [miles] to the east of you right now coming through three thousand and ah clearing detroit's class b [airspace] and we're going over to customs and I have a flight plan on file coming out of windsor so I guess you could go ahead

---

[10] The Airport Authority and Brosnan do not cite the relevant sections of the regulation in their explanation of navigable airspace.  Instead, the Airport Authority and Brosnan submitted multiple maps of the Airport reflecting the regulations.

6

and terminate that when we get there.

Air Traffic Control:   [Helicopter] roger you can proceed uh direct to the customs ramp wind it two three zero at eight altimeter two niner niner one.

To clarify, the pilot indicated that the Helicopter was leaving the airspace around Detroit Metro Airport and was 6.7 miles to the east of the Airport.  Air traffic control directed the pilot to fly to the Customs Circle located within the perimeter of the west cargo ramp.  McMahon says the Helicopter was actually southeast of the Airport.

As the Helicopter descended and approached the Airport, it struck the fifth of the six light poles (from west to east) near the south cargo ramp.  Defendants say the Helicopter was about 45 feet off the ground went it hit the pole.  The accident severed the Helicopter's main rotor system, which caused it to enter a nose dive, crash into the ground, and flip on its right side.  The Helicopter was destroyed as a result of the accident and the crew members were injured.

### E.  The Aftermath.

The parties now dispute the direction from which the Helicopter may have been approaching the Airport.  McMahon says the Helicopter was coming from the south east, not the east, meaning the air traffic controller's instruction to proceed "direct to the customs ramp" caused the Helicopter to hit the light pole.  The radar data, the pilot's statement to the air traffic controller, and visual observations by the air traffic controller and the airport police awaiting the Helicopter's arrival at the Customers Circle, suggest the Helicopter was flying out of due east.

Regardless of the dispute, air traffic control directed the Helicopter to land at the Customs Circle at the *west cargo ramp*.  The Helicopter struck a light pole the Airport

7

Authority and Brosnan say was approximately 102 feet east of the *south cargo ramp*, and 4,170 feet (3/4 mile) away from the nearest edge of the Customs Circle, and 3,400 feet away from the nearest edge of the *west cargo ramp* (see attached exhibit). It is unclear whether McMahon disputes these distances.

After the accident, McMahon collected $540,000 from USSIC, which was the total amount of the policy less the deductible. In accepting the payment, McMahon signed a Bill of Sale and a Proof of Loss. The Proof of Loss, signed on February 9, 2004, by Brian McMahon, specified that the $540,000 payment satisfied USSIC's obligation to McMahon under the insurance policy. The Proof of Loss also included the following paragraphs:

3.    Statement of Loss   Agreed Damages:          $600,000
                           Deductible:              $ 60,000
                           Net Amount to be Paid:   $540,000


8.    SUBROGATION RECEIPT. The Insured [McMahon] covenants that no release has been or will be given to or settlement of compromise made with any third party who may be liable in damages to the Insured and the Insured, in consideration of the payment made under this policy, hereby subrogates the said Company [USSIC] to all rights and causes of action the said Insured has against any person, persons or corporation whomsoever for damage arising out of or indicent to said loss or damage to said property and authorizes said Company to sue in the name of the Insured but at the cost of the Company and such third party, pledging full cooperation in such action.

In 2004, the FAA disbursed the funds Brosnan had requested and the FAA had previously approved to replace the light poles. New, functioning 65 foot light poles were put up; defendants say they are in the same places as the old ones. As required by FAA regulation, the new light poles were also shrouded so that aircraft over head would

8

not mistake them for navigational lights.  As new construction, the light poles underwent

Part 77 review.  A June, 2004, report concluded that the fifth pole could be as high as

143.85 feet before it would penetrate Part 77 navigable airspace.

McMahon disputes that the new pole is the same height and in the same place

as the pole the Helicopter struck.  McMahon says the struck light pole was "as high as

80 feet into the air."  McMahon cites nothing to support this assertion.  Instead,

McMahon says the Airport Authority's removal of the light pole raises a spoliation issue

which allows the fact-finder to infer the destroyed evidence was unfavorable to the

Airport Authority.

**F.  The Lawsuit.**

McMahon filed suit on October 22, 2004.  In the Consolidated Complaint,

McMahon sought damages for the Helicopter (valued "in excess of $1.2 million"), lost

business, and other costs associated with replacing the Helicopter.  USSIC sued to

recover the $540,000 it paid to McMahon under the insurance policy.

On or about May 8, 2006, USSIC released the United States., the Airport

Authority, and Brosnan from all claims in exchange for $10,000 in a signed document

titled Stipulation for Compromise Settlement and Release of All Claims (Release).  The

Release stated:

> 4.     In exchange for [the $10,000], the [USSIC] shall release and
> forever discharge [the United States and the Airport Authority] and
> their employees and agents from any and all actions, claims, and
> liabilities of any type, whether known or unknown, including but not
> limited to those derived from the [Proof of Loss], dated February 9,
> 2004, arising from or in any way relating to the Accident.

> 9.     [USSIC] warrants that it is the sole entity with the right to assert the

claim for the insured portion of the property loss arising out of the Accident and that this right has not and will not be assigned to any party, and, in the event another person or entity makes a claim on behalf of USSIC against [the United States or the Airport Authority] for any or all of this same insured loss, then [USSIC] agrees to indemnify, hold harmless, and defend [the United States and the Airport Authority] from such claim.

USSIC's claims were dismissed.  McMahon's claims against the United States, the Airport Authority, Brosnan and Doe remained.

### III. Discussion.

### A. Legal Standard.

### i.  Motion to Dismiss.

A motion to dismiss under Fed. R. Civ. P. 12(b)(1) will be granted when the Court lacks subject matter jurisdiction to hear the claim.  RMI Titanium Co. v. Westinghouse Elec. Co., 78 F.3d 1125, 1134 (6th Cir. 1996).

### ii.  Motion for Summary Judgment.

Summary judgment will be granted when the moving party demonstrates that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c).  There is no genuine issue of material fact when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The nonmoving party may not rest upon his pleadings; rather, the nonmoving party's response "must set forth specific facts showing that there is a genuine issue for trial."  FED. R. CIV. P. 56(e).  Showing that there is some metaphysical doubt as to the

10

material facts is not enough; "the mere existence of a scintilla of evidence" in support of the nonmoving party is not sufficient to show a genuine issue of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). Rather, the nonmoving party must present "significant probative evidence" in support of its opposition to the motion for summary judgment in order to defeat the motion. See Moore v. Philip Morris Co., 8 F.3d 335, 340 (6th Cir. 1993); see also Anderson, 477 U.S. at 249-50. Additionally, and significantly, "affidavits containing mere conclusions have no probative value" in summary judgment proceedings. Bsharah v. Eltra Corp., 394 F.2d 502, 503 (6th Cir. 1968).

The Court must decide "whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law." In re Dollar Corp., 25 F.3d 1320, 1323 (6th Cir. 1994) (quoting Anderson, 477 U.S. at 251-52). The Court "must view the evidence in the light most favorable to the non-moving party." Employers Ins. of Wausau v. Petroleum Specialties, Inc., 69 F.3d 98, 101 (6th Cir. 1995). Determining credibility, weighing evidence, and drawing reasonable inferences are left to the trier of fact. See Anderson, 477 U.S. at 255. Only where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law may summary judgment be granted. Thompson v. Ashe, 250 F.3d 399, 405 (6th Cir. 2001).

## B. Analysis.

### 1. The United States' Motion.

McMahon's negligence claim against the United States is essentially two claims: (1) negligent provision of air traffic control services; and (2) negligent monitoring of the

11

Airport's compliance with federal regulations. The United State's motion says the Court

lacks subject matter jurisdiction as to the negligent monitoring claim. McMahon

concedes the United States is entitled to its requested relief. The motion is granted and

McMahon's negligent monitoring claim is dismissed; McMahon's negligent provision of

air traffic control services claim continues in the case for trial.

### 3. The Airport Authority's Second Motion (Release).

The Airport Authority says McMahon cannot claim damages for losses

associated with the Helicopter accident because it assigned all rights for damages to

USSIC when it executed the Proof of Loss and accepted the $540,000 insurance

payment. The Airport Authority says McMahon subrogated "all rights and causes of

action" it had against "any person, persons, or corporation...for damage arising out of or

incident to said loss or damage to said property...." to USSIC. The Airport Authority

says McMahon's claim must be dismissed because USSIC released it from

responsibility for all claims derived from the Proof of Loss statement.

McMahon disagrees. McMahon says the subrogation clause it agreed to

protected USSIC–permitting it to recover its loss--and prevented McMahon from double

recovery. McMahon says the subrogation clause was not meant to deny it the ability to

recover damages above and beyond the insured value from a responsible party.

McMahon says the subrogation clause should not prevent it from recovering for the

uninsured value of the Helicopter and for additional damages, such as lost profits,

damage to reputation and credibility, and other economic damages. McMahon says it

subrogated its right for damages "arising out of or incident to said loss" only. McMahon

says paragraph 3 of the Proof of Loss sets the "Agreed Damages" at $600,000, the

12

maximum under the insurance policy.  After subtracting the deductible, USSIC paid
McMahon $540,000.  McMahon says it waived, and USSIC assumed, the right to
pursue a claim for the $540,000 it paid to McMahon.  Finally, McMahon says neither it
nor USSIC intended for the Proof of Loss to cover damages outside the insurance
policy.  Paragraph 9 of the Release says USSIC warranted that "it is the sole entity with
the right to assert the claim for the insured portion of the property loss arising out of the
Accident."[11]  McMahon says the Proof of Loss and the Release pertain to the insured
portion of the property only.

McMahon is correct that the Proof of Loss waived only its right to recover the
insured portion of the destroyed Helicopter.  The Release clarifies this distinction by
specifying that USSIC as subrogee only had a claim for the insured portion.  The Court
disagrees, however, with McMahon's assertion that the insured portion of the Helicopter
was $540,000.  The insured portion was $600,000; McMahon only received $540,000
because of its deductible.  McMahon cannot recover the deductible from the Airport
Authority when it cannot recover it from its insurer.  The Airport Authority's Second
Motion is denied.

**3. The Airport Authority's First Motion.**

---

[11] McMahon also says the Airport Authority waived its right to challenge
McMahon's standing to bring the claim because it did not do so in its answer, and,
therefore, cannot do so on a motion for summary judgment.  The Airport Authority
correctly responds that a plaintiff's standing can be challenged at any time.  Community
First Bank v. Nat'l Credit Union Admin., 41 F.3d 1050 (6th Cir. 1994).

### a. Federal Preemption.

### i. Introduction.

The Airport Authority says McMahon's claim is preempted by federal law. McMahon bases its claims in part on the Michigan common law standard of care. McMahon says the Airport Authority breached this duty of care when it permitted the unmarked, non-functioning light pole to remain near the south cargo ramp without informing the people using the Airport. The Airport Authority says the Federal Aviation Act, 49 U.S.C. § 106 et seq. (Aviation Act), as implemented in Part 77, preempts the common law standard of care airports must meet in operating an airport. Greene v. BF Goodrich Avionics Systems, 409 F.3d 784, 794-795 (6th Cir. 2005). The Airport Authority says the light pole the Helicopter struck was not an obstruction under Part 77, therefore it could not have breached a duty of care in failing to mark, repair, or inform pilots of its presence.

### ii. Legal Standard.

Federal legislation either can expressly or impliedly preempt a state law. The Aviation Act specifically prohibits the states from enacting regulations in certain aviation safety areas.[12] Express preemption does not apply in this case. A federal law may still preempt state law if the federal law thoroughly occupies the legislative field in question; this is implied preemption.

> Implied preemption occurs if a scheme of federal regulation is so
> pervasive as to make reasonable the inference that Congress left no room

---

[12] See e.g., 49 U.S.C. § 41713(b)(1) (preempting the states from enacting regulations regarding the "price, route, or service of an air carrier that may provide air transportation).

14

for the states to supplement it, if the Act of Congress touches a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject, or if the goals sought to be obtained and the obligation imposed reveal a purpose to preclude state authority...a court must begin with the assumption that a state law is valid and should be reluctant to resort to the Supremacy Clause.

Garcia, 385 F.3d 961, 965 (2004).

### iii. Argument.

The Airport Authority says the purpose of the Aviation Act means implied preemption applies here.  The Airport Authority says the purpose of the Aviation Act was to give "[t]he Administrator of the new Federal Aviation Agency full responsibility and authority for the advancement and promulgation of civil aeronautics generally, including promulgation and enforcement of safety regulations."  1958 U.S.C.C.A.N. 3741.  The Airport Authority says the Sixth and Third Circuits have found that the Aviation Act preempted state law in two other areas of aviation safety and should here as well.  Greene, 409 F.3d at 794 (finding federal law imposed no duty to warn of past gyroscope malfunctions and impliedly preempted state law); Abdullah v. Am. Airlines, Inc., 181 F.3d 363 (3rd Cir. 1999) (finding federal law imposed no duty on pilots to avoid turbulent conditions or give warning to passengers and impliedly preempted state law). The Airport Authority says the light pole did not obstruct navigable airspace as defined in Part 77, therefore it did not breach any duty of care to McMahon.

McMahon disagrees that the Aviation Act preempts all state or common law standards of care in the aviation field, and also says its negligence claim against the Aviation Authority is, in part, based on its failure to comply with federal regulations in not maintaining, not marking, and not informing the FAA about the inoperative light pole.

15

McMahon says the federal regulatory scheme is not so pervasive as to preclude Michigan from creating a higher standard of care to prevent injuries at its airports, and Michigan's sovereign status permits it to do so. McMahon says the FAA regulations "are merely minimum safety standards and do not preclude a finding of negligence where a reasonable person would take additional precautions." Sunbird Air Servs., Inc. v. Beech Aircraft Corp., 789 F. Supp. 360, 362-63 (D. Kan. 1992). McMahon also says other circuits have disagreed that federal aviation law preempts state law, and the dissent in Greene concludes that one "cannot assume that the FAA implicitly preempts any State or common law-imposed duties." 409 F.3d at 798.

### iv.  Resolution.

That the Aviation Act has been found to preempt state law in one area of aviation safety does not mean it will in all areas.[13]  However, in rejecting a claim that the Aviation Act preempted state law governing seaplane landing sites, the Sixth Circuit said in dicta that the "FAA has, thus, made clear that ... FAA regulations preempt local law in regard to aircraft safety, the *navigable airspace*, and noise control. Gustafson v. City of Lake Angelus, 76 F.3d 778, 786 (6th Cir. 1996) (emphasis added). The Greene dissent McMahon cites stated that the "situation before us is not like that in Abdullah, because in this case, there are no federal regulations which lay out the exact standard of care." Greene, 409 F.3d at 798. Here, with respect to the light pole's status as an obstruction,

---

[13] McMahon suggests that if federal aviation law preempts state law at airports, the victim of a slip and fall accident at an airport terminal will have no remedy because there is no federal law establishing such a standard of care. In the absence of federal law establishing a standard of care, however, the state law duty applies, thus providing a remedy. This case involves an area where federal law does exist, that being whether an item on airport grounds constitutes an obstruction of navigable airspace.

16

there are Part 77 regulations governing obstructions to navigable air space, and if the

light pole is not an obstruction it need not be marked or identified on a map even if it is

inoperative.  According to numerous FAA maps, Letters of Correction, and other

reports, the light pole, even at 80 feet high, did not intrude into Part 77 navigable

airspace.  The Letters of Correction dating back to 1989 made recommendations for the

Airport to comply with Part 77.  The letters recommended that the Airport Authority

clear trees, remove telephone poles, repair and paint pavement, and mark objects with

reflectors or lights, among other things.  The light pole was never cited in a Letter of

Correction in the record.  McMahon cannot argue that the Airport Authority breached a

standard of care if the light pole was Part 77 compliant because Part 77 establishes the

standard of care.[14]

The FAA monitors and regulates obstructions to navigable airspace.  Since the

Aviation Act and Part 77 establish the standard of care by preempting the field, Greene,

409 F.3d at 794-795,[15] and the light pole was not an obstruction under Part 77 even

when inoperative, unmarked, and unidentified on a map, the Airport Authority's motion

for summary judgment on the preemption issue must be granted and the claim

---

[14] McMahon misses the point of preemption when it says Michigan's desire to
provide a remedy for tortious conduct at public buildings by waiving governmental
immunity defeats any implied preemption by the Act.  Beyond the Court's disagreement
as to the application of the public buildings exception, as discussed below, the issue is
not whether the Airport Authority can be sued for conduct at the Airport.  The issue is
whether federal law dictates that the Airport Authority did not breach a duty of care in
allowing the light pole to be there at all.

[15] It is unclear whether there are special rules for helicopters.  Airplanes land on
runways; helicopters can land on any paved surface and in a different manner.  It is
unclear from the record whether this distinction is relevant to Part 77 compliance.

dismissed.

### b. Governmental Immunity Under State Law.

### i. Introduction.

As an alternative to federal preemption, the Airport Authority says government immunity bars McMahon's claim. Government agencies are immune from liability for some tortious conduct. M.C.L. § 691.1407 says:

> Except as otherwise provided in this act, a governmental agency is immune from tort liability if the governmental agency is engaged in the exercise or discharge of a governmental function.

McMahon concedes that the Airport Authority is a governmental agency under the statute. Absent an applicable exception, therefore, the Airport Authority is immune from suit. The public building exception is at issue here.[16]

### ii. Public Building Exception.

Government immunity does not apply to injuries sustained in public buildings. The statute says:

> Governmental agencies have the obligation to repair and maintain public buildings under their control when open for use by members of the public. Governmental agencies are liable for bodily injury and property damage resulting from a dangerous or defective condition *of a public building* if the governmental agency had actual or constructive knowledge of the defect and, for a reasonable time after acquiring knowledge, failed to remedy the condition or to take action reasonably necessary to protect the public against the condition.

M.C.L. § 691.1406 (emphasis added).

The Court must decide whether the light poles, specifically the fifth light pole that

---

[16] McMahon initially asserted the proprietary function exception. M.C.L. § 691.1413. It withdrew this argument in response to the Airport Authority's motion. Therefore, the Airport Authority's motion is granted as to this exception.

18

the Helicopter struck, could be a dangerous or defective condition "of a public building."[17]  This is a matter of Michigan law and no Michigan court has addressed the issue in the form presented here.  Michigan courts have adopted a test to determine whether the public building exception applies, but the test does not explain how to analyze the phrase "of a public building."  Fane v. Detroit Library Comm'n, 465 Mich. 68, 74 (2001).  The light pole was clearly outside the walls of a building.  This fact is not determinative, however, as an external part of a building "might be truly part of the building itself."  Fane, 465 Mich. at 76 (internal citation omitted).  In such a situation, the Court must "consider the characteristics of the building and the item in question."  Fane, 465 Mich. at 77.

McMahon concedes that the light pole itself is not a public building, but advances two other ways it is "of a public building" so as to be an exception to government immunity.  First, an item is considered part of the building if it is a fixture.  An item is a fixture if it is annexed to realty, its adaptation or application to the realty is appropriate, and it was intended as a permanent accession to the realty.  Fane, 465 Mich. at 78.  Second, if the light pole is not a fixture, McMahon says the Court should consider whether the item or area where the injury occurred is physically connected to and not intended to be removed from the building.  Fane, 465 Mich. at 78.  McMahon says the Court should adopt the first test.

McMahon says the light pole meets the fixture test because it has been attached, either actually or constructively, to the realty, and it has "a possible existence apart from

---

[17] The Airport Authority clearly had notice of the light poles and did not remove them, the other elements of the exception.

19

the realty, but which may, by annexation, be assimilated into realty." Fane, 465 Mich. at 78. McMahon recognizes that the light pole is not attached to a building, but says this is not required. Instead, McMahon says the unique aspects of an airport, the hangar, the poles, and the purpose they serve, means the light pole is a fixture. McMahon says landing strips, hangars, equipment and the light servicing them are necessary elements of an airport. The light pole at issue in this case, McMahon says, is necessary for the loading and unloading of freight at the 24 hour a day commercial Airport, and, to be useful, the light pole could not be attached to the building. McMahon says its would be error to say the light pole is not a fixture because it is not attached to the hangar when doing so would make no sense. Finally, McMahon says whether an object is a fixture is a question of fact for the jury that cannot be resolved on summary judgment. Velmer, 430 Mich. 385, 396 (1988). McMahon says the existence of a jury instruction on the fixture issue suggests that the question is reserved for a jury, not the Court on summary judgment.

The Airport Authority says the light pole is not a fixture because it is not "a permanent accession to the building." Fane, 465 Mich. at 80. Instead, the Airport Authority notes that the light pole was attached to the ground 995 feet from the south hangar, the closest building.

### iv. Resolution.

The light pole is not a fixture, and it is not "of a public building," for purposes of governmental immunity. The light pole is attached to realty, but the realty is land, not a building. The Court cannot expand the meaning of "of a public building" to include a light pole affixed to the ground to provide light to a cargo ramp where aircraft are loaded

20

and unloaded just because the cargo ramp serves a building, in this case a hangar. Contrary to McMahon's claim, the hangar can function without the light pole, as it did before the light pole was erected and after the light pole became inoperative, thus it does not impact the cargo ramp or hangar's function.[18]  The Michigan legislature has waived governmental immunity for a governmental unit to permit individuals to recover for injuries sustained while accessing public buildings.  Adopting McMahon's view would extend governmental unit liability to injuries related to light poles in parking lots servicing a public building.  The cargo ramp is essentially a parking lot for aircraft.  The connection between the light pole and the actual building is too attenuated.  The statute does not distinguish between buildings based on the unique nature or function of the building at issue.

As noted above, if an item is not a fixture, the Court inquires into whether the item or area where the injury occurred is physically connected to and not intended to be removed from the building.  Applying this test, a sidewalk outside of a public building was found to not be "of a public building," Horace v. Pontiac, 456 Mich. 744 (1988), but a terrace was "of a public building" because it was physically connected to a public building and its removal would leave the front door to a library four feet off the ground, Fane, 465 Mich. at 80.  Michigan courts also have declined to find parking lots,[19]

---

[18] An unpublished Michigan Court of Appeals decision concluded that a stairway adjacent to but unattached to a parking structure owned by a city was not a fixture of the parking structure in part because it could be removed without impairing the function of the parking structure.  Bower v. City of Plymouth, 2005 WL 1812631 (Mich. App. August 2, 2005) (citing Fane, 465 Mich. at 78-79).

[19] Merritt v. Dep't of Social Servs., 184 Mich. App. 522 (1989).

driveways,[20] a playground slide,[21] a basketball rim,[22] and other items near a public building to be "of a public building."

If none of these items are fixtures or otherwise "of a public building," the Court is constrained to conclude that the Michigan Supreme Court would not find a genuine issue of material fact exists as to whether the light pole is "of a public building" under either test McMahon proposes.  Whether this makes sense is not determinative; what is determinative is the law of Michigan as enunciated by its Supreme Court.  No exception to governmental immunity applies.  Summary judgment is granted to the Airport Authority and McMahon's case against it is dismissed.

### 4.  The Brosnan Motion.

#### a.  Introduction.

McMahon seeks to hold Brosnan personally liable for the Accident.  Brosnan challenges McMahon's gross negligence claim and asserts six bases for dismissal: (1) absolute immunity; (2) lack of evidence of gross negligence to invoke immunity; (3) immunity under the Michigan Aeronautics Code; (4) federal preemption; (5) lack of a duty to McMahon; and (6) Brosnan's action was not the proximate cause of McMahon's injury.

#### b.  Absolute Immunity.

The Michigan Governmental Immunity Act provides absolute immunity to the

---

[20] Richardson v. Warren Consol. Sch. Dist., 197 Mich. App. 697 (1992).

[21] Jolly v. City of St. Clair, 428 Mich. 860 (1987).

[22] Eberhard v. St. Johns Public Sch., 189 Mich. App. 466 (1991).

22

"highest appointive executive official of all levels of government" for "tort liability for injuries to persons or damages to property if he or she is acting within the scope of his or her...executive function."  M.C.L. § 691.1407(5).

Brosnan says the Airport Authority is a level of government because the Michigan Aeronautics Code, M.C.L. § 259.108 et seq., labels it a "political subdivision" and it has its own board of directors.  Brosnan says as the Airport's highest executive, the airport manager, he qualifies for absolute immunity for allegedly tortious conduct.

McMahon says the Airport Authority is not a level of government for purposes of absolute immunity, and that Brosnan is the Airport's, not the Airport Authority's, highest executive official.  McMahon says none of the factors Michigan courts use to determine whether a government unit is a "level of government" apply to the Airport Authority.  The factors include: the power to levy taxes, the power of eminent domain, jurisdictional breadth, and a wide effect on the community.  Grahovac v. Munising Twp., 263 Mich. App. 589, 591 (2004).  McMahon says the Airport Authority is a subpart of Wayne County and simply operates two airports, meaning it is not covered by absolute immunity.  McMahon further says Brosnan, as director of the Airport, is not the director of the Airport Authority, whose director also governs the Detroit Metro Airport.

Brosnan, as manager of one of the two airports operated by the Airport Authority, is not absolutely immune for his alleged gross negligence.  By Brosnan's own admission he is not the director of the Airport Authority.  Brosnan's motion for summary judgment on the issue of absolute immunity is denied.[23]

_____

[23] The Court declines to opine as to the Airport Authority's status as a "level of government" eligible for absolute immunity.  While neither party adequately discusses

### c.  Brosnan's Alleged Gross Negligence.

McMahon must prove the following elements in a common law negligence action: duty, breach, causation (in fact and proximate), and damages.  A government employee is immune from tort liability unless his or her conduct amounts to "gross negligence." M.C.L. § 691.1407(2).  Gross negligence is "conduct so reckless as to demonstrate a substantial lack of concern for whether any injury results."  M.C.L. § 691.1407(2). Brosnan says no reasonable jury could find that he was grossly negligent because the light pole was Part 77 compliant, was not an obstruction, and that even if operative would have been shielded from view by airborne aircraft.

McMahon says Brosnan knew, for at least five years, that six non-functioning light poles existed near the south cargo ramp and did nothing to prevent an accident. McMahon says if permitting the broken light pole to exist is negligent, permitting it to remain for five years after learning about it is grossly negligent.   McMahon says determining whether Brosnan's conduct was grossly negligent is a fact-sensitive inquiry for the jury.  Taylor v. Detroit, 368 F. Supp. 2d 676, 694 (E.D. Mich. 2005).

When viewed in a light most favorable to McMahon, the Court finds that no genuine issue of material fact exists as to whether Brosnan was grossly negligent.  To so find would be akin to holding a police chief personally liable for his or her officers failing to respond quickly enough to an emergency, or the manager of a regional Michigan Department of Transportation office personally liable for his or her employees failing to fill a pothole.  According to the record, at no time during Brosnan's years at the

---

this issue, it appears that the Airport Authority may exercise the power eminent domain. M.C.L. § 259.116(1)(e).

24

Airport did the FAA, any Airport staff member, or any Airport user express concern about the light pole.  Moreover, if the light pole had been operational the accident likely still would have occurred.

According to McMahon, the light pole implicates Part 77 in at least three ways: its height, its operational ability, and the way it is identified to airport users.  The light pole was Part 77-compliant, based on the record, and at the very least Brosnan never knew or should have known the light pole violated Part 77 based on the reports he received. It is not clear that the FAA knew or that Brosnan informed it that the light pole was inoperative.   The light pole's ability to operate, however, did not impact Part 77 compliance.  In such circumstances, there is no question of fact that Brosnan was not grossly negligent.  Brosnan's motion for summary judgment is granted.

### d.  Immunity Under the Michigan Aeronautics Code.

Alternatively, Brosnan says he is immune under the Michigan Aeronautics Code which states that a

> member of the board or an officer, appointee, or employee of the authority shall not be subject to personal liability when acting in good faith within the scope of his or her authority or on account of liability of the authority, and the board may defend and indemnify a member of the board or an officer, appointee, or employee of the authority against liability arising out of the discharge of his or her official duties.

M.C.L. § 259.116(2).

Brosnan says this is an immunity statute.  McMahon says this is an indemnification statute guaranteeing airport employees protection in case they are sued, meaning the statute clearly contemplates suits being brought against airport employees.  There is no case supporting either interpretation.  The statute plainly says

25

that an employee of the Airport Authority "shall not be subject to personal liability when acting in good faith within the scope of his or her authority."  M.C.L. § 259.116(2). Brosnan's motion is granted.  The statute appears to indemnify *and* immunize airport employees for their official acts.

### e.  Federal Preemption.

The Court has already discussed this issue as part of the Airport Authority's motion.  The same analysis applies here.  McMahon's claim against Brosnan must be dismissed because Part 77 provides the standard of care for airport obstructions, and there is no genuine issue of material fact that the Airport complied with Part 77 according to the FAA.

### f.  Existence of a Duty.

Brosnan only can be personally liable to McMahon if he owed a duty to McMahon.  A duty arises when a defendant has a legal obligation to act for the benefit of the plaintiff.  Rakowski v. Sarb, 269 Mich. App. 619 (2006).  The relationship of the parties and the foreseeability of the risk are two measures of whether a duty attaches. Rakowski, 269 Mich. App. at 629.  As an alternative basis for dismissal, Brosnan says he did not owe any duty to public invitees of the Airport, and that it was unforeseeable that the Helicopter would fly so low to the ground so far from the Customs Circle and strike a Part 77-compliant light pole.

McMahon says airport directors, like Brosnan, have a duty to maintain a safe airport for users, particularly pilots.  McMahon says foreseeability is a question of fact for a jury, and a reasonable jury could find that an unlit, unmarked light pole near an active runway, unidentified on an airport map, could lead to an aircraft accident,

26

particularly at night.  McMahon says Brosnan had the authority to identify the pole on a map, fix the power source to the pole, affix obstruction lighting to the pole, issue a notice to airmen warning pilots of the poles, advise the FAA of the pole during an inspection, and inform air traffic control.  McMahon says any of these actions would have prevented the Accident.  Alternatively, McMahon says that, as an invitee, Brosnan owed it a duty of care to warn it of any known danger, and that the light pole was a known danger.

The Airport Authority generally has a duty of care to maintain a safe airport, not Brosnan personally.  If the Airport failed a FAA inspection, the Airport Authority might replace Brosnan as part of its effort to become FAA compliant, prevent an accident, and avoid liability.   If an accident occurred, Brosnan would not be personally liable for doing his job poorly, the Airport Authority would.  Just like the police chief and transportation manager discussed above, an airport director does not owe a personal duty to all airport users.  Brosnan's motion is granted.[24]

### g. Existence of Causation.

In addition to duty and breach, McMahon must prove at trial that Brosnan was the proximate cause of the accident.  Brosnan says no reasonable jury could find that he was.  Resolution of this issue is unnecessary to the outcome of the motion.

### C.  Conclusion.

The United States' motion for partial dismissal is GRANTED.  McMahon's claim

---

[24] Brosnan can only be liable to McMahon in his official capacity if he violated McMahon's constitutional rights under 28 U.S.C. § 1983.  McMahon does not allege a constitutional violation.

27

against it for negligent provision of air traffic control services remains.  The Airport

Authority and Brosnan's motions are GRANTED in part and DENIED in part.

McMahon's claim against the Airport Authority is DISMISSED based on governmental

immunity and federal preemption.  McMahon's claim against Brosnan is DISMISSED

because no reasonable jury could find that Brosnan was grossly negligent, federal

preemption, Michigan Aeronautics immunity, and the lack of a duty..[25]

Only McMahon's negligence claim against the United States for the negligent

provision of air traffic control services remains.


Dated:  July 28, 2006                              s/Avern Cohn_____
                                                   AVERN COHN
                                                   UNITED STATES DISTRICT JUDGE


I hereby certify that a copy of the foregoing document was mailed to the parties of
record on this date, July 28, 2006, by electronic and/or ordinary mail.


                                                   s/Julie Owens_____
                                                   Case Manager, (313) 234-5160

---

[25] McMahon does little more than assert that the Airport Authority and Brosnan's
failure to alert the FAA that the light pole no longer functioned and did not mark the light
pole after it became inoperative violates Part 77.  McMahon does not cite a specific
regulation.  If the Airport was Part 77 compliant, federal preemption also bars plaintiffs
negligence claims against the Airport Authority and Brosnan.

28